JUDGE JONES

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



------------------------------------------------x

JOSEPH PROCIDA, derivatively
on behalf of the Nominal Defendant,

           Plaintiff,

--against --

KERRY K. KILLINGER, STEPHEN ROTELLA,
THOMAS W. CASEY, JAMES B. CORCORAN,
JOHN F. WOODS,    ANNE V. FARRELL,
STEPHEN E. FRANK, THOMAS C. LEPPERT,
CHARLES    M.    LILLIS,    PHILIP    D.
MATTHEWS,    REGINA    T.    MONTOYA,
MICHAEL K. MURPHY, MARY E. PUGH,
WILLIAM G. REED, JR., ORIN C. SMITH,
JAMES H. STEVER, and JOHN DOES 1-10,,

           Defendants,

    --and--

WASHINGTON MUTUAL, INC.,

           Nominal Defendant.

-----------------------------------------------------------x

____ Civ. ____

**VERIFIED SHAREHOLDER'S**
**DERIVATIVE COMPLAINT**

RECEIVED
JAN 23 2008
U.S.D.C. S.D. N.Y.

**JURY TRIAL DEMANDED**

        Plaintiff, by his attorneys, submits this shareholder's derivative complaint against the defendants named herein. The allegations are asserted on information and belief after due investigation of counsel, except as to those matters which relate to plaintiff and his own acts, which are asserted on personal knowledge.



## INTRODUCTION

1.     This shareholder's derivative action is brought by a long-time shareholder of Washington Mutual, Inc. ("WaMu" or "the Company"), on behalf of WaMu and for its benefit.

2.     The shareholder's derivative action is the only vehicle through which WaMu shareholders can ensure that WaMu insiders are personally held accountable for various breaches of fiduciary duty that harmed the Company, including breaches which led to class actions filed in this District asserting an open market securities fraud, and government actions which implicate certain WaMu officers and directors in an appraisal scam designed to obscure unsound lending practices approved by these individuals.

3.     Washington Mutual is the largest savings and loan in the United States, with assets totaling $346 billion. One of the Company's primary business segments is its Home Loans Group, which generates earnings through the issuance of mortgages and various types of home loans, as well as through the sale and servicing of loans. In the first three quarters of 2007, Washington Mutual originated $116 billion in residential mortgage loans.

4.     As a material part of this business, the Home Loans Group originates and purchases from third-party lenders loans to higher risk borrowers through its sub-prime mortgage channel. The Company either holds such loans in its portfolio or securitizes and sells them.

5.     Borrowers in the sub-prime mortgage channel tend to have greater vulnerability to changes in economic factors, such as increases in unemployment, a slowdown in housing price appreciation or declines in housing prices, than do other borrowers. Therefore, throughout the Relevant Period (April 2006 through the present), Defendants repeatedly admitted that in the home loan market, particularly in the sub-prime and second line segment "Loan-to-value ratios are a key determinant of future performance." As such, the appraised value of the real estate supporting these loans was a critical determinant to both the value and the risk of these loans.

6.     Throughout the Relevant Period, Defendants repeatedly represented that Washington Mutual's management and board of directors, as well as the board's Finance, Audit and Corporate Relations Committees, closely monitored the Company's exposure to risk,

including the risk inherent in the home loan market, stating:

> The Board of Directors, assisted by the Audit and Finance Committees on certain delegated matters, oversees the Company's monitoring and controlling of significant risk exposures, including the Company's policies governing risk management. The Corporate Relations Committee of the Board of Directors oversees the Company's reputation and those elements of operational risk that impact the Company's reputation. Governance and oversight of credit, liquidity and market risks are provided by the Finance Committee of the Board of Directors. Governance and oversight of operational risks are provided by the Audit Committee of the Board of Directors.

7.      In accordance with this continual evaluation, Defendants also repeatedly represented that all loan loss reserves were calculated and reported to investors in compliance with GAAP and FASB Statement No. 5, *Accounting for Contingencies.* Consequently, Washington Mutual shareholders were shocked on November 1, 2007, when the Attorney General of the State of New York (the "Attorney General") filed a lawsuit against First American Corporation ("First American") and its real estate appraisal subsidiary, eAppraiseIT. Washington Mutual is eAppraiseIT's largest customer and it provides appraisal services to Washington Mutual on mortgages and "second lien" home loans, such as home equity lines of credit and home equity loans. According to the Attorney General's complaint, Washington Mutual uses only two outside appraisal firms: eAppraiseIT and Lender's Service Inc. According to the complaint, during the Relevant Period, eAppraiseIT provided over 260,000 appraisals for Washington Mutual.

8.      The Attorney General's complaint alleged that beginning in the April 2006, Washington Mutual executives began strong arming eAppraiseIT to increase the appraised value of homes. The Attorney General's complaint specifically revealed that: eAppraiseIT improperly allowed WaMu's loan production staff to hand-pick appraisers who brought in appraisal values high enough to permit WaMu's loans to close, and improperly permitted WaMu to pressure eAppraiseIT appraisers to change appraisal values that were too low to permit loans to close.

9.      In a press release issued the same day, the Attorney General explained:

> In a scheme detailed in numerous e-mails, eAppraiseIT ("EA"), a subsidiary of First American Corporation (NYSE:FAF), caved to pressure from Washington Mutual ("WaMu") (NYSE:WM) to use a list of preferred "Proven Appraisers" who provided inflated appraisals on homes. *The e-mails also show that executives at EA knew their behavior was illegal, but intentionally broke the law*

*to secure future business with WaMu.*

"The independence of the appraiser is essential to maintaining the integrity of the mortgage industry. *First American and eAppraiseIT violated that independence when Washington Mutual strong-armed them into a system designed to rip off homeowners and investors alike," said Attorney General Cuomo.* "The blatant actions of First American and eAppraiseIT have contributed to the growing foreclosure crisis and turmoil in the housing market. By allowing Washington Mutual to hand-pick appraisers who inflated values, First American helped set the current mortgage crisis in motion."

10.     When investors learned the truth about these  business practices, Washington Mutual's stock price collapsed to a multi-year trading low of $23.59 per share - a decline of over 15%, on very heavy trading volume of over 31 million shares traded - much higher than the Company's average daily trading volume, decimating the Company's market capitalization.  The shares have since further deteriorated, closing at $13.39 per share on January 18, 2008. Moreover, on December 20, 2007, WaMU confirmed that it was under investigation by the SEC and the Office of Thrift Supervision.  The *Wall Street Journal* reported that day that the SEC wants to know whether "the company properly accounted for its loans in financial disclosures to investors of the company."  On top of all this, WaMU may be liable to repurchase loans re-sold or guaranteed by Fannie Mae, a quasi-governmental mortgage lender and guarantor,  if it is determined that the underlying appraisals did not meet Fannie Mae appraisal guidelines.

11.     As explained below, Defendants named in this lawsuit breached their fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. Because a majority of Washington Mutual's directors will not authorize a lawsuit against themselves, Plaintiff brings this action on behalf of Washington Mutual to, among other things, recover the damages caused by Defendants' malfeasance.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over all claims asserted herein under 28  U.S.C. 1332, as complete diversity exists between Plaintiff and each Defendant and the amount in controversy

exceeds the jurisdictional minimum of this Court. Venue is proper in this Court because many of Plaintiffs claims arose in this District, including contribution claims for violations of the federal securities laws; and Washington Mutual has suffered and will continue to suffer harm in this District. This Court also has jurisdiction over this action pursuant to 28 U.S.C 1331 (federal question jurisdiction) insofar as this action arises under both Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. 78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act. Prior to Congress having enacted an express provision for contribution under Section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution pursuant to Section 10(b) of the Exchange Act and Rule 10b-5. *See Musick, Peeler & Garrnett v. Employers Insurance of Wausau,* 508 U.S. 286 (1993). Thus, pursuant to federal statutory law and Supreme Court authority, this Court has original federal question jurisdiction over the federal contribution claim alleged herein. This Court also has subject matter jurisdiction over the pendent state law claims asserted herein pursuant to 28 U.S.C. 1367 (supplemental jurisdiction), since this statute provides that the district court has supplemental jurisdiction over all other claims where, as here, they are so related to claims in the action within the original jurisdiction of the Court that they form part of the same case or controversy.

## THE PARTIES

13.    Plaintiff is the holder of approximately 20,000 WaMu shares, and was prior to the time of the transactions of which Plaintiff complains, an owner and holder of Washington Mutual common stock. Plaintiff is a citizen of New York.

14.    Nominal Defendant Washington Mutual is a corporation organized and existing under the laws of the State of Washington, with its headquarters located at 1301 Second Avenue, Seattle, Washington 98101. Washington Mutual is a citizen of Washington.

15.    Defendant Kerry K. Killinger ("Killinger") is, and at all relevant times has been a member of Washington Mutual's board of directors since 1988, the Chairman of the Board since 1991, and the Chief Executive Officer since 1990. Killinger was also President until 2005.

Killinger is a citizen of Washington.

16.    Defendant Stephen Rotella is, and at all relevant times since January 2005 was, President and Chief Operating Officer ("COO") and a member of the executive committee of Washington Mutual. Rotella is a citizen of Washington.

17.    Defendant Thomas W. Casey ("Casey") is, and at all relevant times was, Chief Financial Officer ("CFO") and member of the executive committee of Washington Mutual. Casey is a citizen of Washington.

18.    Defendant James B. Corcoran ("Corcoran") is, and at all relevant times since May 2006 was, Executive Vice President and President, Retail Banking and a member of the executive committee of Washington Mutual. Corcoran is a citizen of Washington.

19.    Defendant John F. Woods ("Woods") is, and at all relevant times since December 2005 was, Senior Vice President, Chief Accounting Officer and Comptroller of Washington Mutual. Woods is a citizen of Washington.

20.    Defendants Killinger, Casey, Rotella, Corcoran, and Woods are sometimes collectively referred to in this Complaint as the "Officer Defendants." Because of their positions with the Company, the Officer Defendants possessed the power and authority to control the contents of Washington Mutual's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Officer Defendants are liable for the false statements pleaded below.

21.    Defendant Anne V. Farrell ("Farrell") has been a member of Washington Mutual's board of directors since 1994. Farrell is also the chair of the board's Corporate Relations Committee a member of the board's Governance and Finance Committees. Farrell is a citizen of

Washington.

22.     Defendant Stephen E. Frank ("Frank") has been a member of Washington Mutual's board of directors since 1997. Frank is also the chair of the board's Audit Committee, and a member of the Human Resources, Finance, and Corporate Development Committees. Frank is a citizen of California.

23.     Defendant Thomas C. Leppert ("Leppert") has been a member of Washington Mutual's board of directors since 2005. Leppert is also a member of the Board's Audit, Governance and Corporate Relations Committees. Leppert is a citizen of Texas.

24.     Defendant Charles M. Lillis ("Lillis") has been a member of Washington Mutual's board of directors since 2005. Lillis is also a member of the board's Human Resources, Finance, and Corporate Development Committees. Lillis is a citizen of Colorado.

25.     Defendant Philip D. Matthews ("Matthews") has been a member of Washington Mutual's board of directors since 1998. Matthews is also the chair of the board's Audit, Human Resources, Governance and Corporate Development Committees. Matthews is a citizen of California.

26.     Defendant Regina T. Montoya ("Montoya") has been a member of Washington Mutual's board of directors since 2006. Montoya is also a member of the board's Finance and Corporate Relations Committees. Montoya is a citizen of Washington, D.C.

27.     Defendant Michael K. Murphy ("Murphy") has been a member of Washington Mutual's board of directors since 1995. Murphy is also a member of the board's Audit, Finance and Corporate Relations Committees. Murphy is a citizen of Washington.

28.     Margaret Osmer-McQuade ("Osmer-McQuade"), who is not named as defendant herein, has been a member of Washington Mutual's board of Directors since 2002.  Osmer-McQuade sits on WaMu's Finance and Governance Committees.

29.     Defendant, Mary E. Pugh ("Pugh") has been a member of Washington Mutual's board of Directors since 1999. Pugh is also the chair of the board's Finance Committee and a member of the board's Corporate Relations Committee. Pugh is a citizen of Washington.

30.    Defendant, William G. Reed, Jr. ("Reed") has been a member of Washington Mutual's board of Directors since 1970. Reed is also the chair of the board's Governance Committee and a member of the Audit and Finance Committees. Reed is a citizen of Washington.

31.    Defendant, Orin C. Smith ("Smith") has been a member of Washington Mutual's board of Directors since 2005. Smith is also a member of the board's Audit and Finance Committees. Smith is a citizen of Washington.

32.    Defendant, James H. Stever ("Stever") has been a member of Washington Mutual's board of Directors since 1991. Stever is also a member of the board's Governance, Corporate Development and Corporate Relations Committees., Stever is a citizen of Washington.

33.    Defendants Killinger, Farrell, Frank, Leppert, Lillis, Matthews, Murphy, Montoya, Pugh, Reed, Smith and Stever are sometimes collectively referred to in this Complaint as the "Director Defendants." By reason of their positions as directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its shareholders the fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. As a result of these duties, the Director Defendants are obligated to use their best efforts to act in the interests of the Company and shareholders to ensure that no waste of corporate assets occurs. The Director Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.    The John Doe Defendants 1-10 are persons whose precise identities are unknown to Plaintiff, but who are WaMu loan officers and executives who participated in breaches of fiduciary duty by engaging in appraisal manipulations involving EAppraiseIT, as further described herein:

a.    John Doe 1, being that WaMu executive described in the Paragraph 28 of

the Complaint in the action entitled: *People v. First American Corp. et al*, Supreme Court of the State of New York, New York County, filed November 1, 2007, (the "NYAG Action") where it is alleged:

> 28.     By email dated September 29, 2006, *a WaMu executive* wrote to eAppraiseIT's senior executives to define the responsibilities of eAppraiseIT's ABMs as to ROVs and value disputes:

> .     . . . the four appraisers/reviewers would be directly involved in escalations dealing with: ROVs, Valuation issues where the purchase price and appraised value differ with no reconciliations/justifications by the appraiser, Value cuts which we continue to receive from your third party reviewers (Wholesale), **proactively making a decision to override and correct the third party appraiser's value or reviewer's value cut,** when considered appropriate and supported . . . .

>          b.     John Doe 2, being the WaMu Executive described in Paragraph 34 of the

NYAG Action, and assuming this is a person different from those previously described, where it

is alleged:

> 34.     During this period, First American was seeking additional business from WaMu in other areas. But WaMu expressly conditioned giving any future business to First American on success with eAppraiseIT. By email dated September 27, 2006, a First American senior executive advised other senior executives at First American and eAppraiseIT about a conversation he had with *the President of WaMu Mortgage* about long-term business prospects. The First American executive explained that:

> [WaMu] and I discussed our long-term relationship including the money we have on deposit there and our other current business relationships. I told him we would like to expand those relationships. And in exact terms, we would like one half of their flood business, which they currently give 100% to [Corporation A] and their tax business is divided 3 ways among [3 corporations] and that we would like to take [Corporation A's] tax business.

> According to the First American executive, WaMu responded as follows:

> He said that if the appraisal issues are resolved and things are working well he would welcome conversations about expanding our relationship including tax and flood.

Thus, First American knew that WaMu would provide it with new business only if the "appraisal issues" – including WaMu's complaints that eAppraiseIT's appraisers did not provide high enough values – were "resolved."

        c.     John Doe 3, being the WaMu Executive described in Paragraph 40 of the NYAG Action, and assuming this is a person different from those previously described, where it is alleged:

> 40.    These concerns were warranted. eAppraiseIT knew that WaMu's Proven Appraiser List would be composed of appraisers who had been hand-picked by the loan origination staff because they brought in high appraisal values. Indeed, when eAppraiseIT received email requests to add particular appraisers to the panel, the email chains often showed that the requests came directly from WaMu's loan origination staff. Further, *a WaMu Vice President in the Appraisal Oversight group* explained, in an email to eAppraiseIT about an ROV for a "low value," that "This is an example of the issue that has caused sales pushing for a 'proven appraiser' process."

        d.     John Does 4 through 10, being the WaMu Executives described in Paragraph 42 of the NYAG Action as "loan production staff", and assuming they are persons different from those previously described, where it is alleged:

> 42.    eAppraiseIT agreed to the Proven Panel with full knowledge that *WaMu's loan production staff* was selecting appraisers that would "hit value" and provide higher appraisals. In an email dated March 1, 2007, eAppraiseIT's President told WaMu executives:
>
> Recently, we have been notified that Lending would like us to use more of their "Proven Appraisers" versus appraisers off our preselected appraiser panel. It seems the amount of Reconsideration of Value (ROV) requests associated with our appraisers far exceeds those initiated when a WaMu proven appraiser completes a file. Said differently, **WaMu proven appraisers bring the value in a greater majority of the time** with minimal involvement of the vendor, sales and Appraisal Oversight. **I am fine with that, of course, and will happily assign Wamu orders to Wamu proven appraisers instead of eAppraiseIT's approved panel appraiser whenever possible.** (Emphasis added).
>
> With this email, eAppraiseIT's President "happily" agreed to compromise the

company's independence and violate the laws governing appraiser independence.

## FACTUAL BACKGROUND

### Background of the Mortgage Industry

35.     The traditional mortgage industry was characterized by lending institutions originating, servicing and retaining the mortgages until they were repaid in full. Under the traditional model, the lending institution had an interest in obtaining an accurate appraisal to make certain the loan was adequately collateralized in the event the borrower defaulted.

36.     Rather than holding mortgage loans, lenders now regularly sell these mortgages in the financial markets, either directly or to investment banks or Government Sponsored Enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The loans are then pooled together, securitized, and sold to the general public as mortgage backed securities. The money that the lender receives for the sale of the mortgage loans or bonds is then used to finance new mortgages, increasing the lender's profits and aiding its stock price.

37.     This trend in the mortgage industry has also transformed the lending institutions motivations with respect to appraisals. Specifically, it has tended to make lenders less vigilant to assure that the loans are adequately collateralized, since any risk is quickly transferred to the purchasers of the loans. Moreover, lenders' profits are driven by the quantity of loans originated instead of the quality of those loans. Thus, there is an inherent incentive for lender to pressure appraisers to report sufficient values to allow loans to close, whether or not the appraisals accurately reflect the current value.

38.     Further jeopardizing the process, lenders' loan origination staff are almost always paid on commission. Consequently, the income of these individuals depends on the number and size of the loans they are effectively able to close. Accordingly, these loan officers have strong personal incentives to pressure appraisers to value a home at the maximum possible

amount to generate maximum commissions. Thus, lenders and loan officers are motivated to subject real estate appraisers to intense pressure to change values in appraisal reports.

39.    To counteract this inherent tendency for lenders to apply such pressure to appraisers, state and federal statutes and regulations have been adopted that require that appraisals be accurate and independent. The Uniform Standards of Professional Appraisal Practice ("USPAP") have been specifically incorporated into federal law. See 12 C.F.R. § 34.44. USPAP requires appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct).

40.    In 2005, federal regulators including the Office of Thrift Supervision, which regulates savings and loans such Washington Mutual, further published "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions." With regard to appraisal independence, the document provides:

> 3. Who should be considered the loan production staff for purposes of achieving appraiser independence? Could loan production staff select an appraiser?
>
> Answer: The loan production staff consists of those responsible for generating loan volume or approving loans, as well as their subordinates. This would include any employee whose compensation is based on loan volume. Employees responsible for the credit administration function or credit risk management are not considered loan production staff. *Loan production staff should not select appraisers.*
>
> ****
>
> 5. When selecting residential appraisers, may loan production staff use a revolving pre-approved appraiser list, provided list is not under their control?
>
> Answer: Yes, loan production staff may use a revolving, board approved list to select a residential appraiser, *provided the development and maintenance of the list is not under their contra Staff responsible for the development and maintenance of the list should be independent of the loan production process.........*
>
> Further, there should be periodic internal review of the appraiser selection process to ensure that appropriate procedures are being followed and that *controls exist to ensure independence.* (Emphasis added).

**Background of Washington Mutual**

41.    Founded in 1889, Washington Mutual, together with its subsidiaries, is a consumer and small business banking company with operations in major U.S. markets. Based on its consolidated assets at December 31, 2006 the Company had grown to the seventh largest bank in the United States.

42.    Beginning in the early 1990s, Washington Mutual expanded its retail banking and lending operations through a series of acquisitions of retail banking institutions and mortgage companies. The Company currently has four operating segments for management reporting purposes: the Retail Banking Group, which operates a retail bank network of 2,225 branches in fifteen states; the Card Services Group, which operates a nationwide credit card lending business; the Commercial Group, which conducts a multi-family and commercial real estate lending business in selected markets; and the Home Loans Group, which engages in nationwide single-family residential real estate lending, servicing and capital markets activities.

43.    The Company's Home Loans Group generates earnings not only through the issuance of mortgages and various types of home loans, but also through the sale and servicing of loans. To generate these earnings, the Home Loan Group originates and purchases from third-party lenders loans to higher risk borrowers through its sub-prime mortgage channel. The Company either holds these loans in its own portfolio or securitizes and sells them, often retaining the right to service these loans.

44.    Borrowers in the sub-prime mortgage channel tend to have greater vulnerability to changes in economic factors, such as increases in unemployment, a slowdown in housing price appreciation or declines in housing prices, than do other borrowers. Therefore, it is crucial for the Company to monitor the risk presented by these loans which is integrally tied to the loan to value ratio. As a result, accurate and timely appraisals prior to the issuance of these home equity based loans are essential to the evaluation of the risk presented by these loans and to the establishment of accurate loan loss reserves.

45.    In response to the adoption of the state and federal laws and regulations discussed

above, and the threat of stricter federal enforcement, in Spring 2006, Washington Mutual attempted in one fell swoop to both insulate itself from liability and accomplish purported cost cutting initiatives, the Company closed its internal appraisal office and terminated its staff appraisers, and in their place contracted with two appraisal management companies -- eAppraiseIT and Lender's Service, Inc. – to oversee the appraisal process. These companies provided the appearance of a structural buffer between the banks and the appraisers to eliminate potential pressure or conflicts of interest.

46.    According to the New York Attorney General's complaint, however, eAppraiseIT hired approximately 50 of the former Washington Mutual employees to serve as staff appraisers and Appraisal Business Managers ("ABMs"), making one-third of its staff appraisers and one hundred percent of its ABMs former Washington Mutual employees. Then, "at WaMu's request – gave the ABMs the authority to override and revise the values reached by third-party appraisers."

47.    Moreover, the contract between Washington Mutual and eAppraiseIT granted Washington Mutual the right to challenge an appraiser's conclusions by requesting a "reconsideration of value" ("ROV") when Washington Mutual disagreed with an appraised home value set forth in an appraisal report. According to the Attorney General's complaint "this permits WaMu to ask eAppraiseIT to reconsider and raise the value assigned to a home. Throughout the business relationship, WaMu has frequently ordered ROVs from eAppraiseIT."

48.    Furthermore, according to the Attorney General's complaint, the relationship between Washington Mutual and eAppraiseIT continued to evolve to the point that Washington Mutual was allowed to hand pick the appraisers used for the Company's appraisals and black ball appraisers who refused to increase values when requested to do so to allow loans to close. In sum, the Attorney General concluded:

> Despite these representations, First American and eAppraiseIT have abdicated their role in providing "third-party, unbiased valuations" for eAppraiseIT's largest client, WaMu. Instead, eAppraiseIT improperly allows WaMu's loan production staff to hand-pick appraisers who bring in appraisal values high enough to permit WaMu's loans to close, and improperly permits WaMu to pressure eAppraiseIT appraisers to change appraisal values that are too low to permit loans to close. eAppraiseIT compromises its independence even while publicly touting that independence, and despite myriad warnings from its senior management team about the illegal collusion inherent in the

compromises it is making. Instead of preserving its independence, which would have protected consumers and business customers alike, eAppraiseIT chose to protect only itself. And senior executives at First American, though warned by eAppraiseIT's senior management of its compromised independence, nonetheless directed eAppraiseIT to continue its wrongful conduct.

**Defendants' Misrepresented the Nature of Their Mortgage**
**Related Business During the Relevant Period**

49.    **1Q:06 Results Announced**    On April 18, 2006, the inception of the Relevant Period, Defendants caused the Company to publish a press release announcing purported results for the first quarter of 2006, ended March 31, 2006. This release stated, in part, the following:

> Washington Mutual, Inc. (NYSE:WM) today reported first quarter 2006 net income of $985 million, or $0.98 per diluted share, compared with net income of $902 million, or $1.01 per diluted share, in the first quarter of 2005.

> Washington Mutual's Board of Directors declared a cash dividend of 51 cents per share on the company's common stock, up from 50 cents per share in the previous quarter. Dividends on the common stock are payable on May 15, 2006 to shareholders of record as of April 28, 2006.

FIRST QUARTER FINANCIAL SUMMARY
Financial Summary                            Three Months Ended

| | | March 31, 2006 | | December 31, 2005 | | March 31, 2005 |
|---|---|---|---|---|---|---|
| (In millions) | | | | | | |
| Income Statement | | | | | | |
| Net interest income | $ | 2,117 | $ | 2,241 | $ | 1,963 |
| Provision of loan and lease losses | | 82 | | 217 | | 16 |
| Noninterest income | | 1,725 | | 1,602 | | 1,335 |

| | | | |
|---|---|---|---|
| Noninterest expense | | 2,211 | 2,278 | 1,839 |
| Income taxes | | 564 | 483 | 541 |
| Net income | $ | 985 $ | 865 | $ 902 |

**Balance Sheet**

| | | | |
|---|---|---|---|
| Average total assets | $ 344,562 | $ 349,931 | $ 308.172 |
| Average total deposits | 191,034 | 196,799 | 175,185 |

Profitability Ratios

| | | | |
|---|---|---|---|
| Return on average common equity | 14.18% | 12.49% | 16.63% |
| Net interest margin | 2.75 | 2.88 | 2.83 |
| Efficiency ratio | 57.54 | 59.27 | 55.77 |
| Nonperforming assets/total assets | 0.59 | 0.57 | 0.57 |
| Tangible equity/total tangible assets | 5.85 | 5.72 | 5.03 |

50.    In addition to the foregoing, the April 18, 2006 release also quoted Defendant Killinger, in part, as follows:

> *We are very pleased with our first quarter results,* said Kerry Killinger, Washington Mutual chairman and chief executive officer. *The company's strong performance demonstrates the benefits of our continued diversification and enhanced operational focus.* This past quarter we had particularly strong results in Retail Banking and Card Services.
>
> *These businesses added customers at a record pace and delivered significant revenue and earnings even in this difficult interest rate environment,* Killinger added. [Emphasis added]

51.    **1Q:06 Form 10-Q.** On or about May 10, 2006, Defendants filed with the Securities and Exchange Commission (the "SEC") the Company's 1 Q:06 Form 10-Q, for the

quarter ended March 31, 2006, signed and certified by Defendants Killinger and Casey pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. In addition to making substantially similar statements concerning the Company operations, including expenses, costs and ratios, as had been published previously in the Company's April 18, 2006 release, the 1Q:06 Form 10-Q also provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part, as follows:

> Note 1: Accounting Policies
>
> **Basis of Presentation**
>
> The accompanying Consolidated Financial Statements are unaudited and include the accounts of Washington Mutual, Inc. and its subsidiaries ("Washington Mutual" or the "Company"). *The Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ("GAAP")......*[Emphasis added.]

52.    **Controls.**    The Company's 1Q:06 Form 10-Q also contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

> **Controls and Procedures**
>
> **Disclosure Controls and Procedures**
>
> *The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report.* Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period *the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934.*
>
> *Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis,* which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies that may have been discovered.
>
> Changes in Internal Control Over Financial Reporting *Management reviews and evaluates the design and effectiveness of the Company's internal control over*

*financial reporting on an ongoing basis,* which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain their effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal controls. *There have not been any changes in the Company's internal control over financial reporting during the first quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting....* [Emphasis added.]

53.    With regard to the Home Loan Group, the Company's 1Q:06 Form 10-Q stated:

The decrease in net interest income was substantially due to higher transfer pricing charges, which more than offset growth in the interest income generated from loans and investment securities held by this group. The increase in transfer pricing charges was due to higher short-term interest rates. Generally, the Company's transfer pricing methodology is closely aligned with current market interest rate conditions.

The decrease in noninterest income was predominantly due to a flat yield curve and lower fair value sensitivity of MSR to increases in mortgage interest rates, resulting in less favorable MSR asset valuation adjustments in the first quarter of 2006 as compared with the same quarter in the prior year. Also contributing to the decrease in noninterest income was lower gain on sale due to decreased sale volume and lower sale margins.

*The decrease in noninterest expense was primarily due to reduced technology expense and loan expense resulting from productivity and efficiency improvements.* This decrease was largely offset by higher compensation and benefits expense in the first quarter of 2006 compared to the first quarter of 2005, due to a net addition of 1,200 employees to this group over the preceding twelve months. [Emphasis added.]

54.    With regard to loan loss reserves, the Company's 1Q:06 Form 10-Q stated:

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions.

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. The tools utilized for this determination include statistical forecasting models that estimate the default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loss data (primarily for homogeneous loan portfolios). Non-homogeneous loans are individually reviewed and assigned loss factors commensurate with the applicable level of estimated risk.

55.    With regard to specific reserves taken in the first quarter, the Company's IQ:06 Form 10-Q stated:

The Company recorded a provision for loan and lease losses of $82 million in the first quarter of 2006, compared with $217 million in the fourth quarter of 2005 and $16 million in the first quarter of 2005. Reflecting the higher risk profile associated with the unsecured, higher-yielding credit card lending activities that the Company acquired from its purchase of Providian, the provision in the first quarter of 2006 included a provision of $105 million that was attributable to the credit card portfolio. . . . Excluding the credit card portfolio, the Company recorded a $23 million reversal in the provision for loan and lease losses in the most recent quarter, reflecting the continuation of a benign residential credit lending environment that was fostered by generally stable or appreciating housing prices in the Company's geographic markets, low unemployment rates and a relatively low mortgage interest rate environment.

56. The statements made by Defendants and contained in the Company's April 18, 2006 release and those statements contained in the Company's 1Q:06 Form 10-Q were materially false and misleading when made, and were known by Defendants to be false at that time or were recklessly disregarded as such thereby for, among other reasons, the following:

a. At all times during the Relevant Period, Defendants had artificially inflated the Company's mortgage underwriting and origination volume, and underreported its true costs and failed to take adequate reserves for mortgages because, throughout the Relevant Period, Defendants engaged in a conspiracy and illegal course of conduct designed to and which did inflate property appraisals and propped up the Company's results by manipulating Washington Mutual's accounting for revenues and income, and failed to report other material information about the Company;

b. At all times during the Relevant Period, unbeknownst to investors, Defendants had materially overstated the Company's profitability by failing to properly reserve for its inflated mortgages and by failing to properly account for the Company's results of operations, and by artificially inflating the Company's financial results;

c. Throughout the Relevant Period, it was also not true that Washington Mutual contained adequate systems of internal operational or financial controls, such that Washington Mutual's reported financial statements were true, accurate or reliable;

d. As a result of the foregoing, throughout the Relevant Period it also was not true that the Company's financial statements and reports were prepared in accordance with GAAP and SEC rules;

e.    As a result of the aforementioned adverse conditions which Defendants failed to disclose, throughout the Relevant Period, Defendants lacked any reasonable basis to claim that Washington Mutual was operating according to plan, or that Washington Mutual could achieve guidance sponsored and/or endorsed by Defendants; and

f.    As a result of the wrongful and illegal conduct between Washington Mutual and eAppraiseIT described above, Defendants subjected the Company to regulatory investigations and possible prosecution.

57.    **2Q:06 Results Announced.**   On July 19, 2006, Defendants caused the Company to publish a press release announcing purported results for the second quarter of 2006, the period ended June 30, 2006. This release stated, in part, the following:

> Washington Mutual) Inc. (NYSE:WM) today reported second quarter 2006 net income of $767 million, or $0.79 per diluted share, including an after tax adjustment of $101 million to reflect the pending sale of $2.6 billion of mortgage servicing rights and an after tax restructuring charge of $52 million related to the company's efficiency initiatives.
>
> Net income excluding these two items would have been $920 million, or $0.94 per diluted share, compared with net income of $844 million, or $0.95 per diluted share in the second quarter of 2005.
>
> *The company announced today a series of actions it is taking that will significantly improve the company's market risk and greatly accelerate the achievement of its operating efficiency goals, and be accretive to earnings in 2006 and 2007.* [Emphasis added.]

* * *

SECOND QUARTER FINANCIAL SUMMARY

Financial Summary

|  | Three Months Ended | | |
|---|---|---|---|
| (In millions) | June 30, 2006 | March 31, 2006 | June 30, 2005 |
| Income Statement |  |  |  |
| Net interest income | $       2,060 | $    2,117 | $    2,009 |

| | | | |
|---|---|---|---|
| Provision for loan and lease losses | 224 | 82 | 31 |
| Noninterest income | 1,578 | 1,638 | 1,106 |
| Noninterest expense | 2,229 | 2,138 | 1,767 |
| Net income | | | |
| | 767 | 985 | 844 |
| Balance Sheet | | | |
| Average total assets | $ 349,561 $ | 344,562 $ | 320,845 |
| Average total deposits | | | |
| | 200,252 | 191,034 | 183,521 |
| Profitability Ratios | | | |
| Return on average common equity | 11.39% | 14.18% | 15.33% |
| Net interest margin | 2.65 | 2.75 | 2.77 |
| Efficiency ratio | 61.27 | 56.95 | 56.70 |
| Nonperforming assets/total assets | 0.62 | 0.59 | 0.53 |
| Tangible equity/total tangible assets | 5.94 | 5.85 | 5.13 |

58.    In addition to the foregoing, the July 19, 2006 release also quoted Defendant Killinger, in part; as follows:

> Our retail banking and card services businesses produced excellent results and *our business model is performing well in this challenging interest rate environment,* said Kerry Killinger, Washington Mutual Chairman and Chief Executive Officer. *The transformational actions we're taking will make us an even more diversified bank positioned for improved financial performance as we move forward.* [Emphasis added.]

59.    **2Q:06 Form 10-Q.** On or about August 9, 2006, Defendants filed with the SEC the Company's 2Q:06 Form 10-Q, for the quarter ended June 30, 2006, signed and

certified by Defendants Killinger and Casey pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. In addition to making substantially similar statements concerning the Company's operations, including expenses, costs and ratios, as had been published previously in the Company's July 19, 2006 release, the 2Q:06 Form 10-Q also provided statements concerning the Company's Significant Accounting Policies, the Basis of its Accounting Presentation, loan loss reserves, and the Company's internal controls and procedures in essentially the same form set forth in the 1 Q:06 Form 10-Q. With regards to the Home Loan Group, the Company's 2Q:06 Form 10-Q stated:

> The decrease in net interest income was predominantly due to higher transfer pricing charges driven by increasing short-term interest rates and lower average balances of loans held for sale as a result of lower loan volumes. The average balance of loans held for sale during the second quarter of 2006 totaled $23.57 billion, compared with $44.07 billion for the second quarter of 2005. Total loan volume was $41.36 billion in the second quarter of 2006 compared with $53.03 billion for the same period last year.

> The decrease in noninterest income was predominantly due to a less favorable MSR interest rate sensitivity profile and higher MSR risk management costs associated with the current flat yield curve environment, and a decline in the fair value of basis floater interest-only securities, net of derivatives, due to higher prepayments. Basis floater interest-only securities represent rights to the cash flows arising from the difference between the rate received on Option ARM loans and the rate paid on securities underlying Option ARMs sold to investors. These decreases were partially offset by improved margins on loan sales.

> The decrease in noninterest expense was primarily due to lower compensation and benefits expense as commission expense declined.

60.    The statements made by Defendants and contained in the Company's July 19, 2006 release and in the Company's 2Q:06 Form 10-Q were materially false and misleading when made, and were known by Defendants to be false at that time or were recklessly disregarded as such thereby for the reasons stated herein in ¶54, *supra.*

61.    **3Q:06 Results Announced.** On October 18, 2006, Defendants caused the Company to publish a release announcing purported results for the third quarter of 2006, ended September 30, 2006. This release stated, in part, the following:

**Washington Mutual Reports Third Quarter Earnings Per Share of 77 Cents; Results Included Charges Associated with the Sale of Mortgage Servicing Rights and Efficiency Initiatives Board of Directors Increases Cash Dividend to 53 Cents**

SEATTLE - Washington Mutual, Inc. (NYSE: WM) today reported third quarter 2006 net income of $748 million, or $0.77 per diluted share compared with net income of $821 million, or $0.92 per diluted share, in the third quarter of 2005. Third quarter 2006 earnings included net after tax charges of $31 million, or $0.03 per diluted share, related to the 'Previously announced sale of $2.53 billion of mortgage servicing rights, and after tax charges of $33 million, or $0.04 per diluted share, related to the company's ongoing efficiency initiatives, which are expected to continue into the fourth quarter.

WaMu's Board of Directors declared a cash dividend of 53 cents per share on the company's common stock, up from 52 cents per share in the previous quarter. Dividends on the common stock are payable on November 15, 2006 to shareholders of record as of October 31, 2006.

## THIRD QUARTER FINANCIAL SUMMARY AND HIGHLIGHTS

Financial Summary

Three Months Ended

(In millions, except per share data)

| Income Statement | September 30, 2006 | June 30, 2006 | September 30, 2005 |
|---|---|---|---|
| Net interest income | | | |
| | $1,947 | $2,060 | $2,005 |
| Provision for loan and lease losses | 166 | 224 | 52 |
| Noninterest income | 1,570 | 1,578 | 1,208 |
| Noninterest expense | 2,184 | 2,229 | 1,860 |
| Net Income | | | |
| | 748 | 767 | 821 |
| Diluted earnings per common share | $0.77 | $0.79 | $0.92 |

62.    In addition to the foregoing, the October 18, 2006 release also quoted Defendant Killinger, in part, as follows:

*"We continue to focus on the successful execution of our strategic plan despite the challenging operating environment,"* said Kerry Killinger, WaMu Chairman and CEO, noting that, as anticipated, the costs associated with the MSR sale announced in the second quarter and the company's ongoing efficiency initiatives impacted third quarter results. *"Retail Banking, Card Services and the Commercial Group produced solid results, and we continue to aggressively attack our expense base by taking out excess capacity and reducing our overall cost structure."*

Killinger added, *We remain confident in our strategy to reposition the. company and set the stage for stronger performance in 2007.* [Emphasis added.]

63.    **3Q:06 Form 10-Q.** On or about November 9, 2006, Defendants filed with the SEC the Company's 3Q:06 Form 10-Q, for the quarter ended September 30, 2006, signed and certified by Defendants Killinger and Casey pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. In addition to making substantially similar statements concerning the Company's operations, including expenses, costs and ratios, as had been published previously in the Company's October 18, 2006 release, the 3Q:06 Form 10-Q also provided statements concerning the Company's Significant Accounting Policies, the Basis of its Accounting Presentation, loan loss reserves, and the Company's internal controls and procedures in essentially the same form set forth in the 1Q:06 Form 10-Q.

64.    The statements contained in Washington Mutual's October 18, 2006 release and those statements contained in the Company's 3Q:06 Form 10-Q, referenced above, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the reasons stated herein.

65.    **4Q and FY:2006 Results Announced.**    On January 17, 2007, Defendants caused the Company to publish a release announcing purported results for the 4Q and FY:2006, ended December 31, 2006. This release stated, in part, the following:

Washington Mutual, Inc. (NYSE:WM) today reported fourth quarter 2006 net income of $1.06 billion, or $1.10 per diluted share, compared with net income of $865 million, or $0.85 per diluted share, in the fourth quarter 2005. Net income for 2006 was $3.56 billion, or $3.64 per diluted share, compared with net income of $3.43 billion, or $3.73 per diluted share, in 2005.

*    *    *

On Jan. 3, 2007, the company entered into an accelerated share repurchase agreement with a dealer, buying back $2.7 billion of its common stock. The company also increased its cash dividend to 54 cents per common share, up from 53 cents per share in the previous quarter.

\* \* \*

## FOURTH QUARTER AND FULL YEAR FINANCIAL SUMMARY AND HIGHLIGHTS

| Financial Summary | Three Months Ended | | | Year Ended | |
|---|---|---|---|---|---|
| (in millions, except per share data) | Dec. 31, | Sept. 30, | Dec. 31, | Dec. 31, | Dec. 31, |
| | 2006 | 2006 | 2005 | 2006 | 2005 |
| **Income Statement** | | | | | |
| Net interest income | $1,998 | $1,947 | $2,241 | $8,121 | $8,218 |
| Provision for loan and lease losses | 344 | 166 | 217 | 816 | 316 |
| Noninterest income | 1,592 | 1,570 | 1,526 | 6,377 | 5,097 |
| Noninterest expense | 2,257 | 2,184 | 2,214 | 8,807 | 7,620 |
| Income from discontinued operations, net of taxes | 418 | 9 | 8 | 444 | 38 |
| Net income | 1,058 | 748 | 865 | 3,558 | 3,432 |
| Diluted earnings per common share | $1.10 | $0.77 | $0.85 | $3.64 | $3.73 |
| **Balance Sheet** | | | | | |
| Total assets, end of period | $346,288 | $348,877 | $343,573 | $346,288 | $343,573 |
| Average total assets | 353,056 | 349,542 | 349,172 | 348,758 | 326,233 |
| Average interest-earning assets | 314,784 | 312,827 | 314,490 | 312,178 | 294,829 |
| Average total deposits | 214,801 | 208,912 | 196,799 | 203,829 | 186,023 |
| **Profitability Ratios** | | | | | |
| Return on average common equity | 16.03% | 11.47% | 12.85% | 13.52% | 14.91% |
| Net interest margin | 2.58 | 2.53 | 2.88 | 2.60 | 2.79 |
| Efficiency ratio | 62.87 | 62.08 | 58.75 | 60.75 | 57.23 |

| Nonperforming assets/ total assets, end of period | 0.80 | 0.69 | 0.57 | 0.80 | 0.57 |
| Tangible equity/total tangible assets, end of period | 6.04 | 5.86 | 5.62 | 6.04 | 5.62 |

66.    The January 17, 2007 release also quoted Defendant Killinger, in part, as follows:

*We achieved solid performances in our Retail Banking, Card Services and Commercial Group businesses in the fourth quarter and for the full year despite a difficult interest rate and operating environment,* which particularly impacted the results in our Home Loans business, said Kerry Killinger, WaMu Chairman and CEO. *For the full year, we successfully reduced our cost structure and repositioned the balance sheet while continuing to expand our consumer and small business banking franchise.* In 2006, we opened a record 1.23 million net new checking accounts, added a record 848,000 net new retail households and experienced strong cross-sales of the WaMu credit card to our retail banking customers.

Killinger noted that opportunities to grow the balance sheet at attractive risk-adjusted returns are limited, making the accelerated share repurchase transaction a superior use of capital.

*Our outlook for 2007 reflects the strategic actions we took in 2006 to prepare the company for the future, Killinger added. Those decisive actions have positioned us well to deliver stronger operating performance in 2007.* [Emphasis added.]

67.    **2006 Form 10-K.** On or about March 1, 2007, Defendants filed with the SEC the Company's 2006 Form 10-K, for the quarter and year ended December 31, 2006, signed by all the Director Defendants and certified by Defendants Killinger and Casey pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. In addition to making substantially similar statements concerning the Company operations, including expenses, costs and ratios, as had been published previously in the Company's November 18, 2006 release, the 2006 Form 10-K also provided statements concerning the Company's significant accounting policies, including the Fair Value of Certain Financial Instruments and Assets, in part, as follows:

Fair Value of Certain Financial Instruments and Other Assets

A portion of the Company's assets are carried at fair value, including: mortgage

servicing rights, certain retained interests from securitization activities (which are classified as trading assets), available-for-sale securities and derivatives. In addition, *loans held for sale are recorded at the lower of carrying value or fair value.* Changes in fair value of those instruments that qualify as hedged items under fair value hedge accounting are recognized in earnings and offset the changes in fair value of derivatives used as hedge accounting instruments.

*Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.* Generally, for assets that are reported at fair value, the Company uses quoted market prices or internal valuation models that utilize market data inputs where readily available and other assumptions, such as loan prepayment speeds, forward interest rate yield curves, market volatilities and pricing spreads to determine their fair values. The degree of management judgment involved in determining the fair value of a financial instrument or other asset is dependent upon the availability of quoted market prices or observable market value inputs. For financial instruments that are actively traded in the marketplace or whose values are based on readily available market value data, little, if any, subjectivity is applied when determining the instrument's fair value. *When observable market prices and data are not readily available, significant management judgment often is necessary to estimate fair value....*

The following financial instruments and other assets require the Company's most complex judgments and assumptions when estimating fair value:

Mortgage Servicing Rights and Certain Other Retained Interests in Securitizations

MSR and certain other retained interests from securitization activities do not trade in an active, open market with readily quoted prices. Although sales do occur from time to time, the terms of such sales are generally not readily available. Consequently, the Company estimates the fair value of MSR and certain other retained interests in securitization activities utilizing internal discounted cash flow models.

The discounted cash flow model for MSR calculates the present value of the expected future net cash flows of the servicing portfolio based on various assumptions, such as estimated future servicing costs, expected servicing portfolio prepayment speeds and discount rates that are commensurate with the risk profile of the serviced assets. This model is highly sensitive to changes in certain assumptions. Different expected prepayment speeds, in particular, can result in substantial changes in the estimated fair value of MSR. If actual prepayment experience differs materially from the expected prepayment speeds used in the Company's model, this difference would likely result in a material change in MSR fair value. While the Company's model estimates a value, the specific value used is based on a variety of market-based factors, such as documented observable data and expected changes in prepayment speeds. *The reasonableness of management's assumptions about these factors is evaluated through quarterly independent broker surveys. Independent appraisals of the fair value of the mortgage servicing rights are obtained at least quarterly, and are used by management to evaluate the reasonableness of the fair value conclusions....*[Emphasis added}

68.     In addition to the foregoing, the 2006 Form 10-K also provided statements

concerning the Company's accounting for Allowance for Loan Losses and Contingent Risk Liabilities, in part, as follows:

### Allowance for Loan and Lease Losses and Contingent Credit Risk Liabilities

*Allowance for loan and lease losses*

*The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date.* The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of the Company's borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, *the estimated value of underlying collateral,* the interest rate climate as it affects adjustable rate loans and general economic conditions. *Loans held in portfolio that are evaluated for collective impairment and loans held in portfolio that are individually reviewed for impairment but deemed not to be impaired may have both an allocated and unallocated allowance. Loans that are individually deemed to be impaired may only have an allocated allowance*

*The allowance for loans evaluated for collective impairment is comprised of an allocated allowance that is computed for each portfolio based on specific loan portfolio metrics and an unallocated allowance that is computed based on certain environmental factors we believe are not adequately captured in the allocated allowance computations.* Determining the adequacy of the allowance, particularly the unallocated allowance, is complex and requires judgment by management about the effect of matters that are inherently uncertain. Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan and lease losses in future periods.

The allowance is comprised of an allowance for individually impaired loans, as well as all allowance for other individually unimpaired loans that share common risk characteristics that, in the aggregate, have incurred a probable loss on a collective basis. *The determination of common risk factors that indicate a probable loss on a collective basis is complex and requires significant judgment by management about the shared risk characteristics that suggest a probable loss.*

The allowance for loan and lease losses is reported within the Consolidated Statements of Financial Condition and the provision for loan and lease losses is reported within the Consolidated Statements of Income. [Emphasis added.]

69.    **Controls.**    The Company's 2006 Form 10-K again contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

### Controls and Procedures

### Disclosure Controls and Procedures

*The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and*

*procedures as of the end of the period covered by this report.* Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, *the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or furnishes under the Securities Exchange Act of 1934.*

*Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis,* which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.

**Changes in Internal Control Over Financial Reporting**

*Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis,* which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting. *There have not been any changes in the Company's internal control over financial reporting during the fourth quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.* For management's assessment of the Company's internal control over financial reporting, refer to Management's Report on Internal Control Over Financial Reporting on page 79.

\* \* \*

**[p.79] Management's Report on Internal Control Over Financial Reporting**

*The management of Washington Mutual, Inc. and subsidiaries (the "Company", is responsible for establishing and maintaining effective internal control over financial reporting, including safeguarding of assets.* The Company's internal control structure contains monitoring mechanisms, and actions are taken to correct deficiencies identified.
\* \* \*

*Management assessed the effectiveness of the Company's internal control over financial reporting, including safeguarding of assets as of December 31, 2006.* This assessment was based on criteria for effective internal control over financial reporting, including safeguarding of assets, described in "Internal Control Integrated Framework," issued by the Committee of Sponsoring Organizations of the Treadway Commission. *Based on this assessment, management believes that, as of December 31, 2006, the Company maintained effective internal control over financial reporting; including safeguarding of assets.*
[Emphasis added.]

70.     Defendants further reinforced the importance of accurate appraisals to support the Company's home equity based loans, by emphasizing the crucial nature of loan to value ratio, stating in the 2006 Form 10-K

*Loan-to-value ratios are a key determinant of future performance.* Home loans with loan-to-value ratios of greater than 80 percent at origination without

private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. *This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure.* At December 31, 2006, home loans held in portfolio with these features amounted to $7.48 billion and the weighted average loan-to-value ratio at origination of such loans was 88 percent. Substantially all of these loans were made to subprime borrowers, including $5.56 billion of loans purchased from recognized subprime lenders. Total home loans with these features accounted for 16% of the Company's home loan volume in 2006. Home loans held in portfolio with loan-to-value ratios in excess of 90 percent at origination without private mortgage insurance or government guarantees amounted to $847 million, or 0.7%, of home loans held in portfolio at December 31, 2006.

*The Company actively monitors conditions in housing markets in which it has a concentration of home loans.* Geographic concentrations are taken into account when deciding which home loans to sell in the secondary market. Typically, borrowers requesting financing with loan-to-value ratios of greater than 80 percent without government guarantees are required to purchase private mortgage insurance from a third party. In the event of default, the Company can recover losses from the private mortgage insurer. Alternatively, under certain loan programs, qualifying customers can elect to pay a higher interest rate to the Company in lieu of paying for private mortgage insurance. This higher interest rate is expected to compensate the Company for the incremental credit risk inherent in lending to borrowers without private mortgage insurance. [Emphasis added.]

71.    With regards to the Company's Sub-prime Mortgage Channel, the 2006 Form

10-K stated:

### Subprime Mortgage Channel

Through its subprime mortgage channel, the Company originates, purchases and holds for investment, both home loans and home equity loans. Such loans are originated under the Company's Long Beach Mortgage name or are purchased from lenders who are generally recognized as lending to subprime borrowers ("Subprime Lenders"). As of December 31, 2006, subprime mortgage channel loans held for investment totaled $20.77 billion, of which $4.40 billion were originated under the Long Beach Mortgage name and $16.37 billion were purchased from Subprime Lenders.

*As part of Long Beach Mortgage's underwriting process, loan application and appraisal packages are reviewed to ensure conformity with the Company's stated credit guidelines. Collateral appraisal Information is also reviewed by a separate appraisal review group.* Similarly, all purchases from Subprime Lenders must satisfy the Company's stated credit guidelines. The Company does not originate or purchase loan products with negative amortization features through its subprime mortgage channel. [Emphasis added.]

72.    To assure Company shareholders that management and the board of directors monitored the risk posed by such home loans, the Company's 2006 Form 10-K, stated:

*The Board of Directors, assisted by the Audit and Finance Committees on certain delegated matters, oversees the Company's monitoring and controlling of significant risk exposures, including the Company's policies governing risk management. The Corporate Relations Committee of the Board of Directors oversees the Company's reputation and those elements of operational risk that impact the Company's reputation. Governance and oversight of credit, liquidity and market risks are provided by the Finance Committee of the Board of Directors. Governance and oversight of operational risks are provided by the Audit Committee of the Board of Directors.* Risk oversight is also provided by management committees whose membership includes representation from the Company's lines of business and the Enterprise Risk Management function. These committees include the Enterprise Risk Management Committee, the Credit Risk Management Committee, the Market Risk Committee and the Operational Risk Committee.

73.    The statements contained in Washington Mutual's January 17, 2007 release and those statements contained in the Company's 2006 Form 10-K, referenced above, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the reasons previously stated herein.

74.    **1Q:07 Results Announced.**  On April 17, 2007, Defendants caused the Company to publish a release announcing purported results for first quarter of 2007, the period ended March 31, 2007. This release stated, in part, the following:

Washington Mutual, Inc. (NYSE:WM) reported first quarter 2007 net income of $784 million, or $0.86 per diluted share, compared with net income of $985 million, or $0.98 per diluted share, in the first quarter of 2006, a period that included an $85 million after tax partial settlement related to Home Savings goodwill litigation.

Based on these earnings and the company's strong financial position, the Board of Directors increased the cash dividend on the company's common stock for the 47th consecutive quarter to 55 cents per share.

* * *

**FIRST QUARTER FINANCIAL SUMMARY AND HIGHLIGHTS**

-----------------------------------------------------------------------------------

Financial Summary          Three Months Ended

| (in millions, except per share data) | Mar. 31, 2007 | Dec. 31, 2006 | Mar. 31, 2 006 |
|---|---|---|---|
| Income Statement Net | | | |
| interest income | $2,081 | $1,998 | $2,117 |
| Provision for loan and lease losses | 234 | 344 | 82 |
| Noninterest income | 1,541 | 1,592 | 1,638 |
| Noninterest expense | 2,105 | 2,257 | 2,138 |
| Income from continuing operations | 784 | 640 | 976 |
| Income from discontinued operations, net of taxes | | 418 | 9 |
| Net income | 784 | 1,058 | 986 |
| Diluted earnings per common share $ | 0.86 | $1.10 | $0.98 |
| Balance Sheet | | | |
| Total assets, end of period | $ 319,985 | $ 346,288 | $ 348,401 |
| Average total assets | 331,90 | 5353,056 | 343,660 |
| Average interest-earning assets | 295,700 | 314,784 | 307,777 |
| Average total deposits | 210,764 | 214,801 | 191,034 |

Performance Ratios

| Return on average common equity | 12.99% | 16.03% | 14.69% |
|---|---|---|---|
| Net interest margin | 2.79 | 2.58 | 2.75 |
| Efficiency ratio | 58.13 | 62.87 | 56.95 |
| Nonperforming assets/total assets | 1.02 | 0.80 | 0.59 |
| Tangible equity/total tangible assets | 5.78 | 6.04 | 5.75 |

-----------------------------------------------------------------------
----------------------

75.    In addition to the foregoing, the April 17, 2007 release also quoted Defendant Killinger, in part, as follows:

Our Retail Banking, Card Services, and Commercial groups continued to post strong results in the first quarter as we successfully attracted a growing number of new customers to our expanding national banking franchise, said Kerry Killinger, the company's chairman and CEO. *Overall, we delivered solid results in the first quarter despite the challenging interest rate environment and slowing housing market.*

*Our Home Loans business was challenged during the first quarter by difficult market conditions,* he added *Over the past 12 months, we have taken a number of prudent actions to reduce our exposure to the subprime mortgage industry. These actions, along with a diversified business mix, limited our exposure to the mortgage market's downturn and position us well to expand and grow as market conditions improve.* [Emphasis added.]

76.    **1Q:07 Form 10-Q.** On or about May 10, 2007, Defendants filed with the SEC the Company's IQ:07 Form 10-Q, for the quarter ended March 31, 2007, signed and certified by Defendants Killinger and Casey pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. In addition to making substantially similar statements concerning the Company's operations, including expenses, costs and ratios, as had been published previously in the Company's April 17, 2007 release, the 1Q:07 Form 10-Q also provided statements concerning the Company's Significant Accounting Policies, the Basis of its Accounting Presentation, loan loss reserves, and the Company's internal controls and procedures in essentially the same form set forth in the 1Q:06 Form 10-Q.

77.    With regards to the Home Loans Group, the Company's 1Q:07 Form 10-Q stated:

The decrease in net interest income was primarily due to an increase in the funds transfer pricing charge due to rising short-term interest rates that outpaced the upward repricing of loans held for sale. Also contributing to this decline was a shift from noninterest-bearing deposits to interest-bearing deposits. The average balance of loans held for sale during the first quarter of 2007 totaled $32.42 billion, compared with $29.12 billion for the first quarter of 2006.

*The increase in the provision for loan and lease losses was primarily due to growth in purchased home equity loans and higher levels of delinquencies in the subprime mortgage channel.* The decrease in noninterest income was primarily the result of an industry-wide decline in subprime mortgage secondary market performance, which resulted in losses of approximately $164 million in the first quarter of 2007 from both the sale of subprime mortgage loans and declines in the market values of subprime mortgage loans held for sale. Unfavorable subprime secondary market conditions during the first quarter of 2007 also resulted in $88 million of downward adjustments to the value of trading assets retained from subprime mortgage securitizations. Partially offsetting these decreases were gains on the sale of prime home loans.

*The decrease in noninterest expense was primarily due to a significant decline in employee headcount as a result of the Company's 2006 productivity and efficiency initiatives* [Emphasis added.]

78.    The statements contained in Washington Mutual's April 17, 2007 release and those statements contained in the Company's 1Q:07 Form 10-Q, referenced above, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the reasons previously stated herein,.

79.    **2Q:07 Results Announced.** On July 18, 2007, Defendants caused the Company to publish a release announcing purported results for the second quarter of 2007, the period ended June 30, 2007. This release stated, in part, the following:

WaMu (NYSE:WM) announced today that second quarter 2007 earnings per share increased 16 percent from a year ago. Continued strong performance led to net income of $830 million, or $0.92 per diluted share, compared with net income of $767 million, or $0.79 per diluted share, in the second quarter of 2006. Second quarter net income was also up from $784 million, or $0.86 per share, in the prior quarter.

\* \* \*

Based on the quarter's solid performance and the company's strong financial position, the Board of Directors increased the cash dividend on the company's common stock for the 48th consecutive quarter to 56 cents per share.

SECOND QUARTER FINANCIAL SUMMARY AND HIGHLIGHTS
------------------------------------------------------------------
------

Financial Summary

| | Three Months Ended | | |
|---|---|---|---|
| (in millions, except per share data) | June 30, 2007 | Mar. 31, 2007 | June 30, 2006 |
| **Income Statement** | | | |
| Net interest income | $ 2,034 | $ 2,081 | $ 2,060 |
| Provision for loan and lease losses | 372 | 234 | 224 |
| Noninterest income | 1,758 | 1,541 | 1,578 |
| Noninterest expense | 2,138 | 2,105 | 2,229 |
| Income from continuing operations | 830 | 784 | 759 |
| Income from discontinued operations, net of taxes | - | - | 8 |
| Net income | 830 | 784 | 767 |
| | | | |
| Diluted earnings per common share | $ 0.92 | $ 0.86 | $ 0.79 |
| | | | |
| **Balance Sheet** | | | |
| Total assets, end of period | $312,219 | $319,985 | $350,884 |
| Average total assets | 316,004 | 331,905 | 348,664 |
| Average interest-earning assets | 279,836 | 295,700 | 313,239 |
| Average total deposits | 206,765 | 210,764 | 200,252 |
| | | | |
| **Performance Ratios** | | | |
| Return on average common equity | 13.74% | 12.99% | 11.82% |
| Net interest margin | 2.90 | 2.79 | 2.65 |

```
Efficiency ratio                            56.38      58.13
61.27
Nonperforming assets/total assets            1.29       1.02
0.62
Tangible equity/total tangible assets        6.07       5.78
5.84
```

80.    In addition to the foregoing, the July 18,2007 release also quoted Defendant Killinger, in part, as follows:

> *We delivered record growth in our retail banking, credit card and commercial businesses during the second quarter. Our Home Loans' results improved from the first quarter and we are targeting a return to profitability by the end of the year,* said Chairman and CEO Kerry Killinger. I'm pleased with the job our employees are doing in growing the franchise, delivering best-in-Relevant customer service, as evidenced by our recent J.D. Power award recognition, and focusing on improving our operating efficiency. [Emphasis added.]

81.    **2Q:07 Form 10-Q.** On or about August 9, 2007, Defendants filed with the SEC the Company's 2Q:07 Form 10-Q, for the quarter ended June 30, 2007, signed and certified by Defendants Killinger and Casey pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. In addition to making substantially similar statements concerning the Company's operations, including expenses, costs and ratios, as had been published previously in the Company's July 18, 2007 release, the 2Q:07 Form 10-Q also provided statements concerning the Company's loan loss reserves, and the Company's internal controls and procedures in essentially the same form set forth in the 1 Q:06 Form 10-Q. In addition, the 2Q:07 Form 10-Q provided the following discussion of the Company's Significant Accounting Policies and the Basis of its Accounting Presentation:

### Note 1: Summary of Significant Accounting Policies

*Basis of Presentation*

The accompanying Consolidated Financial Statements are unaudited and include the accounts of Washington Mutual, Inc. and its subsidiaries ("Washington Mutual", the "Company", "we", "us" or "our"). *The Company's financial reporting and accounting policies confirm to accounting principles generally accepted in the United States of America ("GAAP"),* which

include certain practices of the banking industry. All significant intercompany transactions and balances have been eliminated in preparing the consolidated financial statements.

\* \* \*

*Recently Issued Accounting Standards Not Yet Adopted*

In September 2006, the Financial Accounting Standards Board ("FASB") issued Statement No. 157, *Fair Value Measurements ("Statement No. 157"). Statement No. 157 prescribes a definition of the term "fair value," establishes a framework for measuring fair value and expands disclosure about fair value measurements.* Statement No. 157 is effective for fiscal years beginning after November 15, 2007. *We do not expect the application of Statement No. 157 to have a material effect on the Consolidated Statements of Income and the Consolidated Statements of Financial Condition.*

In February 2007, the FASB issued Statement No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* ("Statement No. 159"). Statement No. 159 permits an instrument by instrument election to account for certain financial assets and liabilities at fair value. Statement No. 159 is effective for fiscal years beginning after November 15, 2007. We are currently evaluating the impact that Statement No. 159 will have on the Consolidated Statements of Income and the Consolidated Statements of Financial Condition. [Emphasis added.]

82.    With regards to the Company's Home Loans Group, the 2Q:07 Form 10-Q stated:

The decrease in net interest income was primarily due to an increase in the funds transfer pricing charge due to rising short-term interest rates that outpaced the upward repricing of loans held for sale and from a decline in the average balances of custodial deposits. Partially offsetting this decrease was a reduction in the funds transfer pricing charge resulting from the sale of approximately $2.53 billion of mortgage servicing rights in the third quarter of 2006.

*The provision for loan and lease losses increased in response to the downturn in the housing market.* This downturn resulted in increased delinquencies as certain customers were unable to meet their mortgage payments due to interest rates on their adjustable-rate loans resetting upwards.

The decreases in noninterest income were primarily the result of a decline in subprime mortgage secondary market performance, which resulted in net losses of approximately 38 million and $202 million for the three and six month periods ended June 30, 2007 from both the sale of subprime mortgage loans and adjustments to reflect changes in fair values of loans held for sale, net of risk management instruments. Unfavorable subprime secondary market conditions during the first half of 2007 also resulted in $93 million and $181 million of downward adjustments to the fair value of trading assets retained from subprime mortgage securitizations for the three and six month periods ended June 30, 2007. Partially offsetting these decreases were gains on the sale of prime home loans.

The decreases in noninterest expense were primarily due to lower incentive

compensation expense resulting from a decline in the number of loan originations and also reflects a reduction in employee headcount as a result of the Company's 2006 productivity and efficiency initiatives.  [Emphasis added.]

83.     The statements contained in the Company's July 18, 2007 release and those .statements contained in its 2Q:07 Form 10-Q, referenced above, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the reasons previously stated herein..

84.     **3Q:07 Results Announced.** On October 17, 2007, Defendants caused the Company to publish a release announcing purported results for the third quarter of 2007, the period ended September 30, 2007. This release stated, in part, the following:

### *WaMu Reports Third Quarter Earnings Per Share of*
#### *$0.23*
### *Declares Cash Dividend of 56 Cents*

WaMu (NYSE:WM) announced today third quarter 2007 net income of $210 million, or $0.23 per diluted share, compared with net income of $748 million, or $0.77 per diluted share, in the third quarter of 2006. The company attributed the decline to a weaker housing market and disruptions in the capital markets.

* * *

The company also announced its Board of Directors declared a quarterly cash dividend on the company's common stock of 56 cents per share.

85.     Regarding the performance of its business, the October 17, 2007 release also reported on the Company's Retail Banking Operating Segment, in part, as follows:

### THIRD QUARTER OPERATING SEGMENT RESULTS

Retail Banking Group

Selected Segment Information

Three Months Ended

| (in millions, except accounts and households) | September 30, 2007 | June 30, 2007 | September 30, 2006 |
|---|---|---|---|

Net interest income

|                                                      |    |         |    |          |         |
|------------------------------------------------------|----|---------|----|----------|---------|
|                                                      | $  | 1,302   | $  | 1,283 $  | 1,260   |
| Provision for loan and lease losses                  |    | 318     |    | 91       | 53      |
| Noninterest income                                   |    | 833     |    | 819      | 738     |
| Noninterest expense                                  |    | 1,155   |    | 1,137    | 1,079   |
| Net income                                           |    | 453     |    | 559      | 555     |
|                                                      |    |         |    |          |         |
| Average loans                                        | $  | 147,357 | $  | 149,716 $| 180,829 |
| Average retail deposits                              |    | 144,921 |    | 145,252  | 139,954 |
| Net change in number of retail<br>checking accounts  |    | 310,360 |    | 406,243  | 307,433 |
| Net change in retail households                      |    | 161,000 |    | 228,000  | 256,000 |

## THIRD QUARTER FINANCIAL SUMMARY AND HIGHLIGHTS

Selected Financial Information

| (in millions, except per share data) | | Three Months Ended | | | |
|---|---|---|---|---|---|
| | | June 30, | | Mar. 31, | June 30, |
| | | 2007 | | 2007 | 2006 |
| **Income Statement** | | | | | |
| Net interest income | $ | 2,014 | $ | 2,034 $ | 1,947 |
| Provision for loan and lease losses | | 967 | | 372 | 166 |

| | | | |
|---|---|---|---|
| Noninterest income | 1,379 | 1,758 | 1,570 |
| Noninterest expense | 2,153 | 2,138 | 2,184 |
| Net income | 210 | 830 | 748 |
| Diluted earnings per common share | $ 0.23 $ | 0.92 $ | 0.77 |

Balance Sheet

| | | | |
|---|---|---|---|
| Total assets, end of period | $ 330,110 $ | 312,219 $ | 348,877 |
| Average total assets | 320,475 | 316,004 | 349,542 |

| | | | |
|---|---|---|---|
| Average interest-earning assets | 283,263 | 279,836 | 312,827 |
| Average total deposits | 198,649 | 206,764 | 208,912 |

Performance ratios

| | | | |
|---|---|---|---|
| Return on average common equity | 3.45% | 13.74% | 11.47% |
| Net interest margin | 2.86 | 2.90 | 2.53 |
| Efficiency ratio | 63.42 | 56.38 | 62.09 |
| Nonperforming assets/total assets | 1.65 | 1.29 | 0.69 |
| Tangible equity/total tangible assets | 5.61 | 6.07 | 5.86 |

86.    In addition to the foregoing, the October 17, 2007 release also quoted Defendant Killinger, in part, as follows:

"We're disappointed with our third quarter results but they reflect the increasingly difficult market conditions that are challenging the banking industry," said WaMu Chairman and Chief Executive Officer Kerry Killinger. "Despite these challenges, our Retail Banking, Card Services and Commercial businesses delivered good operating performance during the quarter, and *we continued to adapt our Home Loans business to meet market conditions."* Killinger added that the company remains focused on executing its long-term growth plans. [Emphasis added.]

87.    The statements made by Defendants and contained in the Company's October 17, 2006 release were materially false and misleading when made, and were known by Defendants to be false at that time or were recklessly disregarded as such thereby for the reasons previously stated herein.

88.    Taking full advantage in the artificial inflation in the price of Company shares caused as a result of the publication of Defendants materially false and misleading statements, during the Relevant period, as shares traded at levels artificially inflated by the materially false and misleading statements, Company insiders including certain of Defendants named herein together sold over $35 million of their personally held Washington Mutual common stock while in possession of material adverse nonpublic information. Amongst these illegal and improper insider stock sales, while in possession of material adverse non-public information, Defendant Killinger liquidated almost $18.5 million of his personally held Washington Mutual shares.

## The True Financial and Operational Condition of Washington Mutual Begins To Emerge

89.    On November 1, 2007, Washington Mutual shareholders and the investing public were shocked and alarmed after learning that New York Attorney General, Andrew Cuomo had sued Washington Mutual's main appraisers, First American and its subsidiary eAppraiseIT for conspiring to provide the Company with rigged and inflated appraisals. Announcing the suit against First American, the New York Attorney General published a release that stated, in part, the following:

### NY ATTORNEY GENERAL SUES FIRST AMERICAN AND ITS SUBSIDIARY FOR CONSPIRING WITH WASHINGTON MUTUAL TO INFLATE REAL ESTATE APPRAISALS

*Washington Mutual (WaMu) Demanded Appraisers Who Inflated Property Values*

Internal E-Mails Show eAppraiseIT Executives Knew Their Scheme Was Illegal: "We have agreed to roll over and just do it"

NEW YORK, NY (November 1, 2007) - Attorney General Andrew M. Cuomo today announced that he is suing one of the nation's largest real estate appraisal management companies and its parent corporation for colluding with the largest savings and loan in the country to inflate the appraisal values of homes.

*In a scheme detailed in numerous e-mails, eAppraiseIT ("EA"), a subsidiary of First American Corporation(NYSE:FAF), caved to pressure from Washington Mutual ("WaMu") (NYSE: to use a list of preferred "Proven Appraisers" who provided inflated appraisals on homes. The e-mails also show that executives at EA knew their behavior was illegal, but intentionally broke the law to secure future business with WaMu.*

"The independence of the appraiser is essential to maintaining the integrity of the mortgage industry. First American and eAppraiseIT violated that independence when Washington Mutual strong-armed them into a system designed to rip off homeowners and investors alike," said Attorney General Cuomo. *"The blatant actions of First American and eAppraiseIT have contributed to the growing foreclosure crisis and turmoil in the housing market. By allowing Washington Mutual to hand-pick appraisers who inflated values, First American helped set the current mortgage crisis in motion."*

As First American acknowledged in its 2006 annual report, appraisal fraud can damage the entire housing market, including consumers and investors alike. Consumers are harmed because they are misled as to the value of their homes, increasing the risk of foreclosure and hindering their ability to make sound economic decisions. Investors are hurt by such fraud because it skews the value and risk of loans that are sold in financial markets.

*In April 2006, EA began providing appraisal services for WaMu, which became EA's biggest client. Within weeks, WaMu began complaining to EA that its appraisals were not high enough. WaMu pressured EA' to employ exclusively a new panel of appraisers that WaMu hand-selected as "Proven Appraisers." This set of appraisers was chosen by WaMu specifically because their inflated property appraisals. WaMu profited from these higher property appraisals because they could close more home loans, at greater values. Over the course of their relationship, between April 2006 and October 2007, EA provided approximately 262,000 appraisals for WaMu.*

\* \* \*

Attorney General Cuomo's lawsuit seeks to end the illegal relationship between First American and EA and WaMu. It also seeks penalties and disgorgement from First American and EA. The lawsuit alleges that First American and EA violated appraiser independence laws, which regulate the conduct of real estate appraisers. The lawsuit was filed in the Supreme Court of New York, New York County. [Emphasis added.]

90.    The New York Attorney General's investigation uncovered a series of e-mails between executives of eAppraiseIT, First American and Washington Mutual that demonstrated that appraisal officials conspired to violate state and federal appraisal independence rules and regulations in order to comply with pressure and demands by Defendants. These emails, which

evidenced this scheme and illegal course of conduct were summarized in the New York

Attorney General release, in part, as follows:

> * On February 22, 2007, in response to a description of the WaMu "Proven
> Appraiser" program as one in which "we will now assign all Wamu's work to
> Wamu's 'Proven Appraisers'...[and] Performance ratings to retain position as a
> Wamu Proven Appraiser will be based on how many come in on value,"
> eAppraiseIT's president told senior executives at First American: "we have agreed
> to roll over and just do it..."
>
> * On April 4, 2007, eAppraiseIT's executive vice president stated in an e-mail to
> First American: "we as an AMC [Appraisal Management Company] need to
> retain our independence from the lender or it will look like
> collusion...eAppraiseIT is clearly being directed who to select. The
> reasoning...is bogus for many reasons including the most obvious - the
> proven appraisers bring in the values."
>
> * On April 17, 2007, eAppraiseIT's president wrote an email to First
> American explaining why its conduct was illegal: "We view this as a
> violation of the OCC, OTS, FDIC and USPAP influencing regulation."
>
> * *E-mail evidence also shows that WaMu pressured EA to inflate appraisals as a*
> *condition for doing future business together:*
>
> * *On September 27, 2006, First American's vice chairman reported that a WaMu*
> *executive told him: "if the appraisal issues are resolved and things are working*
> *well he would welcome conversations about expanding our relationship..."*
> [Emphasis added.]

91.    The revelations that the Company had conspired to inflate mortgage appraisals,

which had the purpose, cause and effect of materially misrepresented the Company's

financial and operational condition, its controls and procedures and its results of

operations, belatedly revealed on November 1, 2007, caused shares of Washington

Mutual stock to fall precipitously, decimating the Company's market capitalization, and severely

damaging Washington Mutual reputation. As evidence of the harm that these belated revelations

caused Washington Mutual, on November 1 and 2, 2007, shares of the Company collapsed over

15%, on very high trading volume. This share price decline represented a huge loss for

investors and equated to a loss of almost $4 billion of Washington Mutual's market

capitalization during that time. Moreover, according to statements made, at that time, by the New York

Attorney General, but for jurisdictional issues, his office would have pursued action against Washington

Mutual, itself.

92.    Further demonstrating the damage to the Company's reputation, On November

2, 2007, *MarketWatch.com,* an Internet financial news website, reported that the revelations that

Washington Mutual had artificially inflated loans that were in its portfolio as well as loans it

sold and which were later securitized and re-sold, would result in charges to the Company of

between $400 million and $2.1 billion - a loss of as much as $1.57 per share. In addition to the

foregoing, this report stated, in part, the following:

### WaMu vulnerable on securitized mortgages?
### Likely to set aside extra reserves if appraisals found fraudulent: analyst

SAN FRANCISCO (MarketWatch) - *Washington Mutual may have to set aside some $412 million to $2.1 billion in extra reserves* if a lawsuit filed by New York state's attorney general against the mortgage lender succeeds, a Keefe Bruyette & Woods analyst estimated on Friday.

Attorney General Andrew Cuomo announced the suit on Thursday, alleging that First American Corp. and its *eAppraiseIT unit had been "colluding" with Washington Mutual,* also known as WaMu, to inflate the appraisal value of homes.
WaMu suspended its relationship with eAppraiseIT and said it has no incentive to have appraisers inflate home values. First American said the complaint "has no foundation in fact or law."

*If Cuomo succeeds in proving eAppraiseIT's appraisals on WaMu home loans were fraudulent, that could create big problems for the Seattle-based lender,* KBW's Frederick Cannon wrote in a note to clients.

After lenders like WaMu originate home loans, they are often packaged up into mortgage-backed securities and sold to institutional investors around the world. The process gets the loans off the lenders' books, freeing them from the risk that those loans may default and also providing fresh cash to make more new mortgages.

*But if parts of the origination process are found to be fraudulent, investors can potentially force lenders to buy the mortgages back at the original price.* If the assets have suffered delinquencies and have dropped in value, the lender takes a financial hit.

\* \* \*

**Considerable risk**

The lawsuit filed by Cuomo *raises an issue of considerable risk to Washington Mutual: that poorly performing securitized loans will be put back to WaMu from bondholders on the basis of fraudulent appraisals and WaMu would be forced to put bad loans back on its balance sheet,* Cannon said.

*In such a scenario, WaMu would have to buy the loans back at par and then mark them to market on its balance sheet.*

Cannon also questioned WaMu's assertion that it has no incentive to inflate the appraised value of homes that it lends against.

For mortgages that the company originates and then keeps on its balance sheet, the assertion is valid. But for home loans that WaMu sells as mortgage-backed securities, such an argument can be dubious, he said.

*For loans that a bank plans to sell, high appraisals support a greater amount of loans that can be sold, and loan officers are generally paid on volume,* Cannon explained.
*Further, if a mortgage loan is sold it is generally accepted by the lender that they have passed on the default risk to the security holder,* he added. Therefore, it would seem that there indeed could *be an incentive for loan officers and the bank to push for inflated home values in the case of sold loans.*

Cuomo's suit claims that eAppraiseIT provided appraisals or appraisal reviews on roughly 262,000 properties for WaMu between April 2006 and October 2007. If the average loan size was $200,000 to $300,000, this would account for between $52.4 billion and $78.6 billion of loans, Cannon estimated.

During the period in question excluding October 2007, WaMu originated $275.4 billion of real-estate loans, selling $172.5 billion as mortgage-backed securities. As a result, the loans appraised by *eAppraiseIT could account for 19% to 29% of loan production,* the analyst wrote.

*The value of mortgages that could be "put back" to WaMu may be about 133 billion, Cannon estimated That may require additional reserves of $412 million, or the equivalent of 30 cents a share, he said*
*In a worst-case scenario-in which inflated appraisals were systemic throughout WaMu --the lender might need to set aside an extra $2.1 billion, or $1.57 a share, of reserves, he added.* [Emphasis added.]

93.    The same day, the Associated Press also covered this story and it too quoted the New York Attorney General in part, as follows:

*These blatant actions of First American and eAppraiseIT have contributed to the growing foreclosure crisis and turmoil in the housing market,* Cuomo said in a statement. By allowing Washington Mutual to hand-:pick appraisers who inflated values, First American helped set the current mortgage crisis in motion.

*****

*The independence of the appraiser is essential to maintaining the integrity of the mortgage industry,* Cuomo said, citing several emails between the companies' executives.

*First American and eAppraiseIT violated that independence when Washington Mutual strong-armed them into a system designed to rip off homeowners and investors alike,* he said.

Cuomo said that as a state official he didn't have clear jurisdiction to sue the federally chartered Washington Mutual. Cuomo said eAppraiseIT and the parent company knew its actions were illegal, citing an April 17, 2007 e-mail from eAppraiseIT's president to First American that said, "We view this as a violation of the OCC, OTS, FDIC and USPAP influencing regulation."

This is another example where the federal government is asleep at the switch, Cuomo said.

It runs through the entire mortgage spectrum, he said. *Eve one is relying on the appraisal... The appraisal is realty the linchpin of the home buying transaction.* [Emphasis added.]

94.    Defendants' wrongful conduct has significantly and materially damaged the Company. The Company has been and will continue to be forced to incur substantial costs of investigation and defense of Washington Mutual, and its officers and directors with regards to ongoing governmental investigations and the numerous class action securities actions already filed against the Company. Defendants' wrongful conduct has also severely damaged the Company's image, reputation and market capitalization.

## Violations of GAAP and See Reporting Rules

95.    During the Relevant Period, Defendants breached their fiduciary duties to the Company and its shareholders by materially misleading the investing public with regards to the Company financial results, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Such statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP.

96.    GAAP consists of those principles recognized by the accounting

profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

97.    SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

98.    In addition, Item 303 of Regulation S-K requires that. for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided. Instructions to Item 303 require that the this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

Paragraph 3 of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past...

99.    The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by Accounting Principles Board Opinion No. 28. Paragraph 17 of this authoritative pronouncement states that:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

100.    The Company's financial statements contained in the fiscal 2006 Form 10-K and/or the quarterly reports filed with the SEC on Forms 10-Q for the quarterly periods throughout the Relevant Period were presented in a manner that violated the principle of fair financial reporting and the following GAAP, among others:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No.1);

(b)    The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No.1);

(c)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No.2);

(d)    The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No.2);

(e)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASB Statement of Concepts No.2);

(f)    The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28);

(g)    The principle that disclosures of contingencies shall be repeated in interim

and annual reports until the contingencies have been removed, resolved, or have become immaterial (APB Opinion No. 28); and

(h) The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

101.    In addition, during the Relevant Period, Defendants violated SEC disclosure rules:

(a)    Defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. §229.303), and that failure to disclose the information rendered the statements that were made during the Relevant Period materially false and misleading; and

(b)    by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. § 210.4(a)(1).

102.    To fulfill their fiduciary duty to the Company and its shareholders, Defendants were required to disclose, in the Company's financial statements, the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. The Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP. Defendants knew, or were reckless in not knowing, the facts which indicated that the fiscal 2006 Form 10-K and all of the Company's interim financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the Relevant Period, were materially false and misleading for the reasons set forth herein. Had the true financial position and results of operations of the Company been disclosed during the Relevant Period, the Company's common stock would have traded at prices well below that which it did.

## ILLEGAL INSIDER SELLING

103.    While in possession of the undisclosed material adverse information, the following Officer and/or Director Defendants, hereafter referred to as the insider Selling

Defendants, sold the following shares of Washington Mutual stock:

**INSIDER TRANSACTIONS REPORTED DURING THE RELEVANT PERIOD**

| Date | Insider | Shares | Sale / Disposition | Value |
|------|---------|--------|--------------------|-------|
| 15-Jun-07 CORCORAN JAMES B<br>Officer | | 1,590 | $43.07 | $68,481 |
| 1-May-07 KILLINGER KERRY K<br>Officer | | 50,000 | $42 - $42.13 | $2,103,001 |
| 30-Mar-07 CASEY THOMAS W<br>Officer | | 1,246 | $40.38 | $50,313 |
| 15-Feb-07 FARRELL ANNE V<br>Officer | | 1,233 | $44.90 | $55,361 |
| 13-Feb-07 CASEY THOMAS W<br>Officer | | 11,032 | $44.76 - $44.77 | $494,001 |
| 1-Feb-07 KILLINGER KERRY K<br>Officer | | 50,000 $44.59 | - $44.73 | $2,233,000 |
| 26-Jan-07 CASEY THOMAS W<br>Officer | | 3,968 | $45.31 | $179,791 |
| 26-Jan-07 ROTELLA STEPHEN J<br>Officer | | 4,4557 | $45.31 | $206,47 |
| 26-Jan-07 KILLINGER KERRY K<br>Officer | | 16,130 | $45.31 | $730,851 |
| 22-Jan-07 MATTHEWS PHILIP D<br>Officer | | 1,440 | $45.00 | $64,80 |
| 19-Jan-07 CASEY THOMAS W<br>Officer | | 14,300 | $44.67 | $638,781 |
| 19-Jan-07 ROTELLA STEPHEN J<br>Officer | | 16,666 | $44.67 | $744,47 |
| 19-Jan-07 KILLINGER KERRY K<br>Officer | | 12,021 | $44.67 | $536,97 |
| 15-Dec-06 WOODS JOHN F<br>Officer | | 1,464 | $45.23 | $66,21 |
| 1-Nov-06 KILLINGER KERRY K<br>Officer | | 50,000 | $42.28 - $42.46 | $2,119,00 |
| 1-Aug-06 KILLINGER KERRY K<br>Officer | | 50,000 | $44.34 - $44.55 | $2,222,00 |

| | | | |
|---|---|---|---|
| 1-Aug-06 KILLINGER KERRY K<br>Officer | 1,688 | $44.40 | $74,94 |
| 21 -Jul- 06 KILLINGER KERRY K<br>Officer | 126,470 | $45.50 | $5,754,385 |
| 30-May-06 CASEY THOMAS W<br>Officer | 22,155 | $45.32 | $1,004,06 |
| 1-May-06 KILLINGER KERRY K<br>Officer | 50,000 | $44.90 - $45.00 | $2,248,00 |

## DEMAND FUTILITY

104.   Plaintiff brings this action derivatively in the right and for the benefit of Washington Mutual to redress damage suffered and to be suffered by Washington Mutual as a direct result of Defendants' breaches of fiduciary duty, corporate mismanagement, and abuse of control. This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have. Plaintiff will adequately and fairly represent the interests of Washington Mutual and its shareholders in enforcing and prosecuting their rights. Plaintiff will adequately and fairly represent the interests of Washington Mutual in enforcing and prosecuting its rights.

105.   Plaintiff is and was an owner of the stock of Washington Mutual during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

106.   Plaintiff has not made any demand on the present Board of Directors of Washington Mutual to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

a.   The current Board of Washington Mutual consists of the following 13 individuals: Defendants Killinger, Farrell, Frank, Leppert, Lillis, Matthews, Murphy, Montoya, Pugh, Reed, Smith and Stever, and non-defendant Osmer-McQuade.

b.   As a result of their access to and review of internal

corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the Defendants and Osmer-McQuade knew the adverse non public information regarding the improper accounting. While in possession of this material adverse non public information regarding the Company, the following current members of the Washington Mutual Board participated in the illegal insider selling:

(i)    During the Relevant Period, Killinger sold 406,309 shares of Washington Mutual stock for proceeds of $17,954,660;

(ii)    During the Relevant Period, Farrell sold 1,233 shares of Washington Mutual stock for proceeds of $55,361; and

(iii)    During the Relevant Period, Matthews sold 1,440 shares of Washington Mutual stock for proceeds of $64,800.

Because these Defendants received a personal financial benefit from the challenged insider trading transactions, these Defendants are interested and any demand upon them is futile;

(a)    The principal professional occupation of Defendant Killinger is his employment with Washington Mutual, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically, for 2006 Washington Mutual paid Defendant Killinger $14,245,859 in total compensation, including material portions consisting of incentive compensation, stock awards and bonuses based upon the Company's reported performance. This lack of independence renders Defendant Killinger incapable of impartially considering a demand to commence and vigorously prosecute this action;

(b)    According to Washington Mutual's Proxy Statement filed with the SEC on or about April 17, 2007, Defendants Frank (Chair), Leppert, Matthews, Murphy, Reed, and Smith were, during the Relevant Period, members of the Audit Committee. Pursuant to the Audit Committee Charter, the Audit Committee is responsible for:

> A.    The integrity , of the Company's financial reporting process and financial statements and systems of internal controls;
> B.    The Company's compliance with legal and regulatory requirements;
> C.    The independent auditor's qualifications and independence and performance; and
> D.    The performance of the Company's internal audit function.

Moreover, as repeatedly represented to the Company's shareholders during the Relevant Period, the Audit Committee was further responsible for overseeing "the Company's. monitoring and controlling of significant risk exposures, including the Company's policies governing risk management." In sum, "*governance and oversight of operational risks are provided by the Audit Committee of the Board of Directors.*" To fulfill these responsibilities, the Audit Committee members' meet periodically with management, the independent public accountants and internal auditors to review matters relating to the Company's financial statements, accounting principles and systems of internal accounting controls. Moreover, the Audit Committee was specifically required to "have such meetings with management as the Committee deems appropriate to discuss significant risk exposures facing the Company and to discuss the steps that management has taken to monitor and control such exposures, including the Company's guidelines and policies governing risk assessment and risk management." During FY:06, the Audit Committee met nine times. According to the Company's Audit Committee Charter, the Audit Committee is required to review with management and the independent

auditors any significant matters identified as a result of the independent auditors' interim review procedures prior to the filing of each Form 10-Q and 10-K. Nonetheless, the Audit Committee recommended that the Board of Directors issue the improper press releases and Form 10-Q's, 10-K's and 8-K's, as tiled with the SEC. By such actions, Defendants Frank, Leppert, Matthews, Murphy, Reed, and Smith breached their duties by causing or allowing the improper financials described above. As a result of these Defendants' breach of their duties, any demand upon them is futile;

(e)     According to Washington Mutual's Proxy Statement filed with the SEC on or about April 17, 2007, Defendants Pugh (Chair), Farrell, Frank, Lillis, Montoya, Murphy, and Reed were, during the Relevant Period, members of the Finance Committee. Pursuant to the Finance Committee Charter, the Finance Committee is responsible for:

> Approving and monitoring the administration of policies (the "Finance Policies") that address the Company's allocation of capital to various business initiatives and govern the Company's financial risk management, including the acquisition, retention, management and disposition of assets and liabilities, and the management of market risk (both interest rate risk and liquidity risk) and credit risk.

Moreover, as repeatedly represented to the Company's shareholders during the Relevant Period, the Finance Committee was further responsible for overseeing *"the Company's monitoring and controlling of significant risk exposures, including the Company's policies governing risk management."* In sum, Defendants repeatedly represented that "Governance and oversight of credit, liquidity and market risks are provided by the Finance Committee of the Board of Directors." To fulfill these responsibilities, the Finance Committee is required to monitor "the development and implementation of strategies that guide the Company's financial management activities, including capital, funds, liquidity, interest rate risk and credit risk management," as well

as "aspects of financial activities of the Company's key subsidiaries that are material to the Company's business and its return on its investment in these subsidiaries." During FY:06, the Finance Committee met five times. Nonetheless, the Finance Committee allowed and permitted Washington Mutual to engage in the business practices set forth herein which exposed the Company to unnecessary and unwarranted risk with regards to the Company's mortgage portfolio. By such actions, Defendants Pugh, Farrell, Frank, Lillis, Montoya, Murphy, and Reed breached their duties by causing or allowing the improper conduct described above. As a result of these Defendants' breach of their duties, any demand upon them is futile;

       (f)      According to Washington Mutual's Proxy Statement filed with the SEC on or about April 17, 2007, Defendants Farrell (Chair), Leppert, Montoya, Murphy, Pugh and Stever were, during the Relevant Period, members of the Corporate Relations Committee. Pursuant to the Corporate Relations Committee Charter, the Committee's most crucial role is to "Reviewing, evaluating and overseeing the Company's reputation." Moreover, as repeatedly represented to the Company's shareholders during the Relevant Period, *"[t]he Corporate Relations Committee of the Board of Directors oversees the Company's reputation and those elements of operational risk that impact the Company's reputation."* Nonetheless, the Corporate Relations Committee allowed and permitted Washington Mutual to engage in the business practices set forth herein which severely damaged the Company's reputation and goodwill. By such actions, Defendants Farrell, Leppert, Montoya, Murphy, Pugh and Stever breached their duties by causing or allowing the improper conduct described above. As a result of these Defendants' breach of their duties, any demand upon them is futile;

(g)     The Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein. In addition to the conflicts that exist as a result of their participation in the improper accounting and insider selling, as detailed herein supra, the majority of the Board, including Defendants listed below, are subject to the following prejudicial entanglements:

i.     Defendant Pugh is the founder and President of Pugh Capital Management, to which Washington Mutual paid $175,694 in 2006 for investment advisory services. Because of this long standing and entangling business relationships, Defendant Pugh will not take the action requested by Plaintiff herein against one another or the remainder of the Individual Defendants;

ii.     Defendants Frank, Reed and Smith are members of the board of directors of one or more companies with which Washington Mutual transacted business in 2006. Because of this long standing and entangling business relationships, Defendants Frank, Reed and Smith will not take the action requested by Plaintiff herein against one another or the remainder of the Individual Defendants; and

iii.     Defendants Farrell and Frank and Smith are each a member of the board of trustees of one or more charitable entities to which Washington Mutual made a cash donation during 2006. Because of this long standing and entangling business relationships, Defendants Farrell, Frank, and Smith will not take the action requested by Plaintiff herein against one another or the remainder of the Individual Defendants.

(h)     The entire Washington Mutual Board and senior management participated in the wrongs complained of herein. Each of the above Defendants breached the fiduciary duties that they owed to Washington Mutual and its shareholders in that they failed to prevent and correct the improper financials. Thus, the Washington Mutual Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Washington Mutual to millions of dollars in liability for possible violations of applicable securities laws;

i.     The Director Defendants of Washington Mutual, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Washington Mutual's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

ii.     In order to bring this suit, all of the directors of Washington Mutual would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

iii.     The acts complained of constitute violations of the fiduciary duties owed by Washington Mutual 's officers and directors and these acts are incapable of ratification;

(1)     Each of the Director Defendants of Washington Mutual authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal

beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(m)    Any suit by the current directors of Washington Mutual to remedy these wrongs would likely expose the Individual Defendants and Washington Mutual to further potential liability under the securities laws that would result in civil actions being filed against one or more of the Individual Defendants. Thus, they are hopelessly conflicted in making any supposedly independent determination;

(n)    Any suit by the current directors of Washington Mutual to remedy these wrongs would likely expose the Individual Defendants and Washington Mutual to disclosure of further violations of Federal banking regulations which could result in civil or governmental actions being filed against one or more of the Individual Defendants. Thus any action by the Washington Mutual Board to fairly consider suit, would result in likely further liability and/or disclosure of negative information. Thus, the Board is, hopelessly conflicted in making any supposedly independent determination whether to bring suit.

(o)    Washington Mutual has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Washington Mutual any part of the damages Washington Mutual suffered and will suffer thereby;

(p)    If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in complaints for violations of securities law, which admissions

would impair their defense of the actions and greatly increase the probability of their personal liability in the actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities actions. They will not do this. Thus, demand is futile; and

(q)    If Washington Mutual's current and past officers and directors are protected against personal liability for their breaches of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Washington Mutual. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering Defendants in this case contain provisions that eliminate coverage for any action brought directly by Washington Mutual against these Defendants, known as, *inter cilia,* the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Washington Mutual, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Washington Mutual to sue them, since they will face a large uninsured liability.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Against The Class Action Individual Defendants for Contribution Pursuant to Sections 10(b) and 21D of the Exchange Act)

107.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.  This cause of action is asserted against those individual defendants who have also been named as defendants in the related securities fraud class actions (the "Class Action Individual Defendants").

108.     The Class Action Individual Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial information and projections.

109.     The Class Action Individual Defendants have been sued in the Class Action alleging that the Class Action Individual Defendants caused the Company to issue false and misleading statements as alleged above and, as a result, the Company and these defendants violated Section 10(b) of the Exchange Act.

110.     It is alleged in the Class Action that the Class Action Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts regarding Washington Mutual their control

over, and/or receipt and/or modification of Washington Mutual's allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Washington Mutual participated in the fraudulent scheme alleged herein.

111.    These Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.    The ongoing alleged fraudulent scheme alleged in the Class Action could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including these Individual Defendants.

112.    During the Class Period, it is alleged in the Class Action Complaint that the Class Action Individual Defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including the Class members, as alleged herein; (ii) enabled Defendants to register for sale with the SEC, millions of shares of their privately held Company stock; (iii) enabled Washington Mutual and certain Company insiders to sell approximately $122 million of their privately held Washington Mutual shares while in possession of material adverse non-public information about the Company; and (iii) caused plaintiff and other members of the Class to purchase Washington Mutual common stock at artificially inflated prices. As alleged in the Class Action, these defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain

artificially high market prices for Washington Mutual's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

113.    In addition to the duties of full disclosure imposed on these defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's business, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

114.    It is alleged in the Class Action that the Class Action Individual Defendants, individually and in concert, directly and indirectly, by the use of the mails or other means or instrumentalities of interstate commerce, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, and future prospects of Washington Mutual as specified herein. These Defendants are alleged to have employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Washington Mutual's value and future profitability. This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made about Washington Mutual and its business, operations and future prospects, in the light of the circumstances under which they were made, not misleading, and engaging in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Washington Mutual securities during the Class Period.

115.    As alleged in the Class Action, as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Washington Mutual's securities was artificially inflated during the Class Period.    Unaware of the fact that the market price of Washington Mutual's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements during the Class Period, Class members acquired Washington Mutual's securities during the Class Period at artificially high prices and were damaged thereby.

116.    As alleged in the Class Action, at the time of said misrepresentations and omissions, the Class members were unaware of their falsity, and believed them to be true. Had the members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Washington Mutual, which were not disclosed by these defendants, members of the Class would not have purchased or otherwise acquired their Washington Mutual's securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

117.    As alleged in the Class Action, by virtue of the foregoing, these Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5.

118.    It is further alleged in the Class Action that the Company participated in the wrongful conduct and is equally liable for violation of Section 10(b) of the Exchange Act. Assuming that the Company is liable, these Individual Defendants caused the Company to violate Section 10(b) of the Exchange Act, and incur liability for damages for violation of the federal securities laws.

119.    If the Company is deemed to have violated the federal securities laws, and incurs damages therefore, the Class Action Individual Defendants are liable to the Company for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

## SECOND CAUSE OF ACTION

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

120.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

121.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Washington Mutual common stock on the basis of such information.

122.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Washington Mutual common stock.

123.    At the time of their stock sales, the Insider Selling Defendants knew that the

Company's revenues were materially overstated. The Insider Selling Defendants' sales of Washington Mutual common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

124.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## THIRD CAUSE OF ACTION

### Against All Defendants for Breach of Fiduciary Duty

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    The Individual Defendants owed and owe Washington Mutual fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Washington Mutual the highest obligation of good faith, fair dealing, loyalty and due care.

127.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

128.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect

and promote the Company's corporate interests.

129.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Washington Mutual has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

130.    Plaintiff on behalf of Washington Mutual has no adequate remedy at law.

### . **FOURTH CAUSE OF ACTION**

#### **Against All Defendants for Waste of Corporate Assets**

131.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Defendants have caused Washington Mutual to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

133.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

134.    Plaintiff on behalf of Washington Mutual has no adequate remedy at law.

### **FIFTH CAUSE OF ACTION**

#### **Against All Defendants for Unjust Enrichment**

135.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

136.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Washington Mutual.

137.    Plaintiff, as a shareholder and representative of Washington Mutual, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Washington Mutual has an effective remedy;

C.    Awarding to Washington Mutual restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 17, 2008

**ROY JACOBS & ASSOCIATES**

By: _____

Roy L. Jacobs (RLJ 0286)

60 East 42nd Street, 46th Floor
New York, NY 10165
Tel. (212) 867-1156
Fax (212) 504-8343

rjacobs@jacobsclasslaw.com

*Attorneys for Plaintiff*

## <u>VERIFICATION</u>

Joseph PRocida , declares, this 3 day of January, 2008 as follows:

    1.    I am the Plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof, and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.